UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   - against -

                                      S4 06 Cr. 1089 (BSJ)

DOMINICK DEVITO et al.

                      Defendants.

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT DOMINICK DEVITO'S MOTION
## FOR SEVERANCE OF COUNTS AND/OR PARTIES

### INTRODUCTION

Defendant Dominick Devito respectfully submits this Memorandum of Law together with the accompanying affidavit of George L. Santangelo, Esq. in support of his motion for (A) an order pursuant to Fed. R. Crim. Pro. 8(a) severing misjoined counts or pursuant to Fed. R. Crim. Pro. 8(b) severing misjoined parties; (B) an order pursuant to Fed. R. Crim. Pro. 14(a) severing prejudicially joined counts or parties; and (C) such other and further relief as this Court may deem just and proper.    Mr. Devito moves for severance of Count 13 because that count is misjoined and would occasion severe prejudice against Mr. Devito on the other counts.  Count Thirteen charges Mr. Devito with obstruction of justice in violation of 18 U.S.C. § 1503 through submission to the Department of Probation in connection with a prior conviction for bank fraud of an allegedly false affidavit of net worth.  Trial of Count 13 with the other counts would unnecessarily place before the jury evidence of Mr. Devito's prior conviction for bank fraud, and would severely prejudice him in his trial on the other counts, including multiple counts of bank fraud.

1

Mr. Devito moves to sever his trial from that of his codefendants because tapes that the government has furnished in discovery, while potentially admissible against other defendants who make numerous statements on them, contain clearly inadmissible hearsay that is severely prejudicial against Mr. Devito. These tapes were made by informants and contain statements of the three other defendants but not of Mr. Devito. As alleged in Count 14 of the indictment, a primary topic of discussion on the tapes is an idea suggested by an informant, John DeBello, to intentionally damage a home that he owned and to fraudulently procure insurance proceeds as a consequence. The tapes do not reflect any participation or knowledge whatsoever by Mr. Devito who was, in any event, in prison at the time. In fact, the participants make clear that they do not want Mr. Devito to even find out about their idea. Regardless, the tapes also contain numerous references to prior damage to the Brae Burn property (also owned by DeBello) that is also alleged to be part of the Count 14 conspiracy as well as the Count 15 substantive charge of insurance fraud. Numerous hearsay statements on the tapes state that Devito orchestrated the damage, filed fraudulent claims and profited. A great deal of anger at Devito is expressed by DeBello, the owner of Brae Burn and landlord to Devito, co-defendant Liscio, the insurance agent and others. These and highly prejudicial statements about Devito are all over the tapes, including also about unrelated matters and insinuations of organized crime relations.

The severance is required because the other three defendants are on the tapes making numerous statements that are presumably admissible against them but are rank and prejudicial hearsay as to Mr. Devito. Numerous statements require severance under *Bruton v. United States,* 391 U.S. 123 (1968) because, even if admissions of codefendants, they are hearsay as to Devito yet implicate him in charged past criminal activity concerning the Brae Burn property. The statements are not admissible as statements in furtherance of the prospective conspiracy to damage the informant DeBello's second house because (1)

2

Devito is clearly not part of the conspiracy because he is in prison and the others do not want him to know or find out; (2) numerous statements by DeBello and the other informant, Lamanna, cannot qualify because they are government agents; (3) the historical statements about past activities at Brae Burn do not further any ongoing conspiracy.  The tapes also contain inadmissible testimonial statements under *Crawford v. Washington,* 541 U.S. 36 (2004) because they are made by and at the behest of government informants who go to lengths to make statements of their own and to influence the making of statements by others.  Finally, severance is also required simply by the severe prejudice to Mr. Devito from statements on the tapes. Whether about Brae Burn or unrelated topics, the statements about Mr. Devito are beyond the pale in terms of prejudice, as Mr. Devito is described variously and repeatedly as the "devil" or "scumbag" and worse and it is insinuated that he commits crimes regularly and may have organized crime connections.   Mr. Devito cannot receive a fair trial with such evidence before the jury.

## A.    The Indictment

The fourth superseding indictment contains 15 counts, naming four defendants, Dominick Devito, Robert DiDonato, John Liscio and Louis Cordasco, Jr.  The counts can be divided into three groups.

(1)  Bank Fraud Counts. Count One charges Devito and DiDonato with a broad conspiracy between January, 2002 and November, 2004 to commit bank fraud in violation of 18 U.S.C. § 1349, alleging in connection with purchase of various residential properties in Westchester County that mortgage and home equity loans were obtained through provision of various items of false information, for example, as to the chain of title of the property, the borrower's income and assets, and the nature of the transactions.   Counts Two through Twelve charge substantive bank fraud in violation of 18 U.S.C. § 1344 in respect to specific properties.

(2) Obstruction Count.  Count Thirteen charges Mr. Devito with obstruction of justice in violation of 18 U.S.C. § 1503 through submission to the Department of Probation of an allegedly false affidavit of net worth.

(3)  Insurance Fraud Counts.  Count Fourteen charges all four defendants under 18 U.S.C. § 1349 with mail fraud conspiracy from January, 2003 and February, 2005 for alleged agreement to submit false insurance claims for water damage at two residences.  Count Fifteen alleges substantive mail fraud in violation of 18 U.S.C. § 1341 in regard to the Brae Burn property, one of the properties at issue in Count Fourteen.[1]

## B.    The Tapes

The tapes that mandate severance are summarized here, but no description in a memo of law could convey compehensively to the Court the rank hearsay and severe and irreversible prejudice contained within them.  The government has furnished a number of cd's of conversations recorded by the informants roughly in the period November, 2004 through February, 2005.  In many instances the government did not provide a draft transcript of the conversations, and in those cases characterizations and quotes are taken from the tapes themselves.  In other instances, the government has provided draft transcripts.  Certain of these conversations,  for example, November 10, 2004, January 29, 2004, February 2, 2005, February 8, 2005, are transcribed.  Although in counsel's submission, the Court would benefit tremendously from reading these transcripts in their entirety, we are advised that the rules for electronic filing in the district preclude their filing because they are too long.   We suggest and stand ready to provide hard copies or other suitable copies of the transcripts in full to aid the Court's consideration of the motion.  Page references are to those transcripts.

_____

[1] The indictment also seeks separate forfeiture under Counts One through Twelve on the one hand, and

4

The tapes in question range from November, 2004 through February, 2005. None of the tapes record a single statement by Mr. Devito. In fact, between November, 2003 and November, 2005, Mr. Devito was incarcerated in federal prison. Nor is there any statement on the tapes indicating any involvement from a distance by Mr. Devito in any active matter under discussion. Rather, the innumerable references to Mr. Devito all involve descriptions of alleged past acts of Mr. Devito, characterizations of Mr. Devito and at most a bit of speculation as to the intentions of Mr. Devito upon release from prison.

The tapes were all consensual recordings made with wires worn by John DeBello and Joseph Lamanna who were cooperating with the FBI. These men were specially interested in making or inducing critical statements about Mr. Devito. Both were involved at the time in civil litigation with Devito and Robert DiDonato. The suit involved the 28 Brae Burn property which was owned by DeBello but had been rented to Devito when a pipe burst causing extensive property damage. DeBello alleged, as the government alleges here, that Devito and others caused the pipe to burst and improperly claimed insurance proceeds. Devito counterclaimed for unpaid construction fees in building the house and attached liens on the property to that end. Thus, DeBello and Lamanna literally have an enormous stake in this prosecution and literally had every incentive to make and induce statements, dutifully recorded by the FBI, concerning the dispute over the past pipe breaking at 28 Brae Burn.

The others heard on the tapes are primarily defendant John Liscio and defendant Lou Cardasco, and to a lesser extent, defendant Robert DiDonato and a man named Robert Midollo, identified as a cousin of Devito's wife.

The tapes concern two counts in the indictment: Count Fourteen which charges all four defendants under 18 U.S.C. § 1349 with mail fraud conspiracy from January, 2003 and February, 2005 for alleged

---

Counts Fourteen through Fifteen on the other.

agreement to submit false insurance claims for water damage at two residences, 28 Brae Burn and 4350

Purchase in Westchester County, New York;    Count Fifteen which alleges substantive mail fraud in

violation of 18 U.S.C. § 1341 in regard to the Brae Burn property.

Although the 4350 Purchase conspiracy was purportedly ongoing at the time the tapes were made,

the tapes, made by government informants with ulterior motives, surprisingly do not stay on this topic.

Notably, however, Mr. Devito is not invoked in these discussions as having any involvement in the 4350

Purchase matter.  In fact, there are several references among the conversants to not telling Devito about the

4350 Purchase discussions and concerns about Devito's reaction were he to find out.  To put it mildly,

Devito is not involved and is not referenced as a conspirator during these discussions.

The tapes do refer to Devito in at least two other ways, however.  First, there are numerous

references to the 28 Brae Burn pipe breaking and insurance claims.  As noted above, DeBello, working

with the government, and a civil plaintiff against Devito concerning that property, had every interest in

raising this topic and making and inducing hearsay statements about it.  DeBello continually injects 28

Brae Burn into the conversation and makes any number of comments that are indisputably self-serving

as to him and damaging as to Mr. Devito.  DeBello also engages other conversants into commentary on

this topic, Liscio in particular.  Thus, the tapes are littered with historical and repetitive commentary as

to what happened with 28 Brae Burn.  Although the tapes make clear that Mr. Devito is not part of any

conspiracy at the time of the tapes' making, apart from that, it is equally clear that these historical

statements about 28 Brae Burn, made largely by a government cooperator who knows he is being taped

in any event, do not further any continuing conspiracy regarding 4350 Purchase or anything else for that

matter.

A predominant topic on the tapes, interspersed among references to 4350 Purchase and 28 Brae Burn is a cavalcade of hearsay character assassination directed at Mr. Devito.  Mr. Devito is disparaged as a "devil" a "scumbag" and worse.  He and his family are characterized as involved in organized crime, gambling, and any number of sordid activities by individuals predominantly passing along gossip and not stating any matters of personal observation or knowledge.

*November 10, 2004.*    This conversation between John DeBello and John Liscio touches on prospective insurance fraud only at the end where DeBello, citing his financial woes, suggests that he set fire to his Scarsdale home to collect insurance money.  At this point, DeBello and Liscio purport to discuss the various homes owned by DeBello and the insurance coverage on them.  Government Transcript at 32-36,40.

   None of these discussions mention Devito at all.  In fact, the conversants obviously do not want Mr. Devito to even know of any such plans, and DeBello in particular expresses concern about "when he's getting out," and wanting to "sell everything and just leave before he does."  36.  The tape makes frequent reference to the past water damage at Brae Burn:

- DeBello and Liscio discussing the lawsuit between DeBello and Devito, 4-6
- Liscio claiming Devito "killed" his insurance business because of suspicions over the Brae Burn claim and DeBello claiming he was the one who was killed and Devito "blindsided" him.  11-12,22.
- Liscio discussing how he was called about the broken pipe and extensive water damage at Brae Burn, called in a restoration company and surveyed the site, and saw the boiler explode.  13-14.
- Liscio saying that DeBello had given wrong information about the house, and how it was a "nightmare" dealing with the insurance, and that Devito had called in an adjustor Liscio "assume[d]" was "dirty."  14.
- DeBello saying that Devito said the damage would be $50-100,000 and denying "pulling some shit."  DeBello not knowing Devito claimed $700,000 and disputing the damages could be close to that.  15-16
- Liscio saying that Devito "took control of the whole thing" and that Liscio wanted "to make something too" 25  Further that Liscio lost his company and the "veins were popping out of my head" with anger at Devito and he told Devito's father that his son made $300,000 and was a liar.  26-27.
- Liscio saying he thought DeBello was making money too, and DeBello denying that and asking why Liscio let Devito file claims.  25, 28-29

- Further references to Devito's money, making "ninety thousand dollars on a fuckin rug." Liscio saying "everybody got paid off" and Liscio helped "orchestrate" the claims. 39-40

There are also numerous references to character aspersions against Mr. Devito and various bad acts he was alleged to have undertaken. Examples include:

- DeBello suggesting someone named "Dee" was "screwing" him on a construction project and that Dee and Devito are friends. 3-4,10
- How DeBello couldn't sell Brae Burn because it was regarded as a "Mafia guy's house" and his personal financial difficulties. 20-21.
- The suggestion that Devito's cousin Robbie Midollo got "screwed" by Devito and DeBello's claim that he and Lamanna were regarded by Devito as "fresh meat" and that Devito tried to "steal" money and the house. 6-8.
- Liscio's suggestion that Devito did something similar before in regard to a mansion and his complaint that Devito, a "fucking scumbag," spread a rumor that he gave Liscio $100,000 to support a cocaine habit. 17-18,38
- DeBello's suggestion that Devito's mother "set him up" and his father was involved in gambling. 19
- "Another Dominick [Devito] fiasco" involving construction in front of a mansion. 22
- Liscio saying he thought "Sonny" (apparently a reference to Devito's father) was wired and badmouthed Devito in response. 23.
- DeBello and Liscio's assertion that Devito "fuck[s] people" and DeBello's complaint that he was coereced to loan him money when Devito had legal problems.30.
- DeBello's assertion that Devito took houses in Joe Lamanna's name and mortgaged them and kept the money. 31.
- Devito as a "wannabe mobster" who "passed threats." 31.

*January 29, 2005.* During this conversation DeBello, wearing a wire for the government, and Liscio appear to continue discussing some sort of insurance fraud scheme. DeBello suggests that he would like to make $50,000 on a claim. Government Transcript at 4-5. They discuss which house to use to make a claim. 7 They discuss the merits of using a home not yet complete because builder's risk insurance only covers fire. 9. They discuss the benefits available for particular damage, clean up crews through Liscio's contacts and the particular insurance companies involved. 15-16 Liscio agrees to look into it. DeBello asks to have someone from a clean up company come to help decide what pipe to break. 18 Liscio agrees to look into the claims and insurance history on all of DeBello's properties. 35. Again, there are no references to the

8

incarcerated Devito having knowledge much less participation in these discussions. And again, there are references to Devito getting out of prison and whether they would have "a problem with him" and the opinions of Liscio that Devito wont "wanna fuckin see you guys" and by DeBello that he's "gonna run for the hills" because "he knows he scammed us." 28.

Again, there are frequent references to Brae Burn, including:

- Liscio again saying how the entire episode ruined his insurance business, but that Devito had said "you could make more money than your profit sharing" but Liscio never received anything beyond standard broker's percentage. 5-6
- Who broke the pipe and the opinion that Devito did it or had someone do it. 10.
- How Devito used an outside adjustor and "beefed up the claim." 17
- Devito arranged to be away to allow credible build up of damages. 19
- Devito "duped the insurance company" and the adjustor Melillo. 20.
- Speculation that Devito may have involved "wise guys" 20
- DeBello claiming he was worried about the amount claimed and Liscio responding "the prick wanted as much money as he could get" and "That's a lot of fucking money he took." Devito profited $300,000 and kept all the money. 22.
- Liscio said Devito "fucked" everyone involved even though it was "understood before this whole thing went down" that the money would be shared. 23 Liscio thought he would get $50,000. 26

There are also numerous references to character aspersions against Mr. Devito and various bad acts he was alleged to have undertaken. Examples include:

- The suggestion that "Dee" was causing problems with DeBello's construction project, possibly at Devito's behest, and possibly in response to DeBello evicting Devito's family from Brae Burn. The complication that Devito "screw[ed]" Dee too over construction work not paid for. 7-8
- Speculation that Devito filed a fraudulent insurance claim on the carriage house at 3801 Purchase St. and collected $125,000 on $10-15,000 out of pocket losses. 11
- Liscio's "feeling" that Dan Forbes would also file a false claim and that "Forbes is a scam artist with Dom." 12.
- Suggestions by DeBello that Devito's parents know or are involved in illicit activity and that Devito has organized crime connections. 13
- Liscio's complaint that Devito started a rumor that he gave him $100,000 for cocaine. and never gave Liscio anything for other insurance claims. 23-27
- DeBello's complaint that he cant sell Brae Burn because Devito through DiDonato "put out there" that Brae Burn had damage or organized crime issues. 31
- Discussions of defendant DiDonato ("scumbag") who got paid on various matters and Forbes and whether he got "screwed" or was in with Devito 33

9

*February 1, 2005.*  This conversation is not transcribed by the government but takes place between Joseph Lamanna, working undercover for the government, and defendant Robert DiDonato.  Lamanna makes a reference to the litigation with Devito, saying "I'm balls to the walls."   Lamanna later says, he is "getting slaughtered by these guys.  Tell me what magic did you work to get money out of them (laughing)?"   He later says Devito "ruined his life."   Lamanna opines that Devito must have been behind stolen copper gutters at his mansion.  Lamanna repeats that Devito made his life miserable and that he wants to get a fresh start and get away.

*February 2, 2005.*   This is a conversation recorded by cooperator John DeBello with defendants Liscio and Cardasco.  The three have a conversation that appears to be about ways to create damage at DeBello's property.  Liscio says to Cardasco "you can get the clean up and construction" Government Transcript at 4-5  They talk about the insurance coverage and details concerning the accident and insurance submission. 9-12.  They discuss these details at length, apparently walking through the house as they do so. 13-35.   Again, there are no references whatsoever to any involvement of Devito in any of these plans.  Liscio at one point dismisses him, saying "so he's in jail so…"  12

There are a few references to the previous Brae Burn situation, including:

- Comments by DeBello in apparent reference to Devito that "he took the money."  Liscio says, "Dominick took the money for the damage to the structure and he took the contents and junked them okay."6
- Comments by DeBello that Devito broke the copper line at the house.  8
- Liscio's frustration but his statement "I got fucked, so he's in jail so—" 12
- How Devito "got a lot of money, 90 thousand for a rug that wasn't worth anything." 26

And, again, there are some references to other activities, including discussion of another house at Scott Circle, 7.

*February 8, 2005.*  This is a conversation, again recorded by DeBello with defendant Cardasco and Robbie Midollo at DeBello's home.  The government furnished a transcript of part of this conversation. They appear to discuss details of causing damage. They discuss possibly setting a fire but Midollo says that could be traced.  Government Transcript at 3.  They discuss details of plumbing and other arrangements.  6-11  They talk about alternative properties, including a different home of DeBello or a home of Lamanna and the various insurance coverage.  14-22, 36-.  There are no references to Devito having the slightest involvement.  Again, it comes up that Devito is in jail.  34  DeBello says he fears being victimized again by Devito.  39.  In the untranscribed portion of the tape DeBello again states his opinion that Devito will not come back when released from prison:  "He's not gonna come back here.  You're not gonna see him." Others offer their opinon, and Midollo thinks Devito will realize he did wrong and come back.

Again there are references to Brae Burn, including:

- A comment by Cardasco that Devito broke the copper pipe there. 10
- Comment by DeBello that Devito did Brae Burn "all on his own behind my back." 17
- DeBello complaining about the unexpected size of the claim and Devito "circumventing [him] with the check. 23
- Cardasco in particular saying that Devito lied or exaggerated the furnishing claims. 23-24
- Details about how the pipe was damaged and how DiDonato would check on it and reported to Cardasco when it broke. 26-28

And continuing bad act and other references to other activities, including:

- DeBello's comment about Lamanna's problems at his mansion and opinion that Devito is behind it and that Forbes is "fronting" for him in Greenwich. 29-30
- DeBello again describing problems with "Dee" and his own construction.  38
- Midollo makes a litany of references to bad acts he claims Devito undertook. 31-35.  At various points Midollo calls him a "piece of shit" and "bad news."  Cardasco calls him an "evil genius."  39
- References to some claimed fraud on Lou Cherico and various other episodes.  40-48

These references continue at some length in the portion of the tape that the government did not transcribe.

At one point Devito is called the "Devil."

11

*February 16, 2005.*  This important conversation between DeBello, recording it on behalf of the government, and Liscio and Cordasco at the home of Liscio, was not transcribed by the government. Various details of the contemplated pipe breaking are discussed and how warm weather was impeding the effort.  There are references by DeBello to how at Brae Burn Devito "did a wonderful job" and got away with it.

DeBello at one point suggests that they damage a different house that he owns on Long Island.  This idea is discussed at length including how to handle with insurers that the house is presently vacant.

Also, the others discuss how Devito will react if he finds out about what they are planning: "You know, Dominick is gonna find out about it."  "Yeah, hell be upset."  Numerous references to Devito mistreating various members of their group are advanced, including Midollo the cousin.  It is clear that the group does <u>not</u> want Devito to know what is transpiring.  Liscio says, "…there's ways to do it and there's ways to do it.  You know?  And one thing that he didn't think of, if something happens and Dominick gets wind of this…"  On the heels of this, DeBello again floats the idea of doing his house on Long Island instead.  With respect to the Purchase property in Westchester, DeBello fears, "Yeah he'll get wind of what happened, yeah."  Cardasco responds that "there's too much down side than up side"  Later, Liscio again expresses his concern that "Dominick will find out."

This tape also contains the usual references to Brae Burn and how the pipe was broken and how Devito got away with it.   There are references to the litigation and other supposed schemes as well, including gambling and implicit organized crime references.

## ARGUMENT

**I.     Defendant Devito's Case Must Be Severed From Liscio, Cordasco and DiDonato To Prevent Egregiously Prejudicial and Inadmissible Hearsay Against Mr. Devito From <u>Being Presented To the Jury.</u>**

Defendant Devito must have his case severed from his codefendants because the above-described tapes would expose his jury to an avalanche of hearsay and egregiously prejudicial evidence that would violate incurably his basic right to a fair trial.   The tapes would put before the jury self serving statements of government informants and hearsay statements by the other defendants implicating Mr. Devito in one of the insurance fraud charges in the case in clear violation of defendant's rights to a fair trial and confrontation under *Bruton v. United States,* 391 U.S. 123 (1968) as well as *Crawford v. Washington,* 541 U.S. 36 (2004).   Moreover, the tapes  are littered with flagrantly prejudicial characterizations of Mr. Devito by the defendants and the government informants that, apart from hearsay and rights to confrontation, would violate Mr. Devito's basic right to a fair trial.

## A.     <u>Severance Under Rule 14 or Misjoinder Under Rule 8</u>

Under Rule 14 of the Federal Rules of Criminal Procedure: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed.R.Crim.P. 14(a).  A trial judge has a "continuing duty at all stages of the trial to grant  a severance if prejudice does appear." *Schaffer v. United States,,* 362 U.S. 511, 516 (1960).  Such prejudice exists when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539 (1993).   Motions to sever under Rule 14 are "committed to the sound discretion of the trial judge." *United States v. Rittweger,* 524 F.3d 171, 178 (2d Cir.2008).   Case law, obviously, has developed situations, however, where severance is virtually mandated.  These include, as relevant here, where a codefendant's hearsay confession implicates the defendant under  *Bruton v. United*

*States,* 391 U.S. 123 (1968), or where introduction of a defendant's prior conviction would cause undue preducice. *United States v. Jones*, 16 F.3d 487, 492 (2d Cir. 1994). *See* Point II, *infra*,

The standards relating to severance for misjoinder under Rule 8 of the Federal Rules of Criminal Procedure are discussed in Part II, *infra*. Although severance based on the tapes is addressed principally under Rule 14, Mr. Devito also seeks severance for misjoinder under Rule 8(b) in particular because Count 14, the mail fraud conspiracy alleging insurance fraud, inappropriately joins parties in one count who as to the prospective branch of the conspiracy as set forth on the tapes, clearly are not under an agreement. Rather, as set forth in the tapes and discussed below, the individuals discussing further insurance fraud clearly do not want Devito (then in prison) to know of their efforts and consciously exclude him. *Cf. United States v. Gallo*, 1998 WL 9848 (S.D.N.Y. 1999)(finding separate conspiracies charged and granting severance for misjoinder).

**B.     Even Where Admissible Against Other Defendants, the Tapes Are Full of Statements That Are Blatant Hearsay and Would Violate Defendant's <u>Confrontation Rights Under *Bruton v. United States*, 391 U.S. 123 (1968).</u>**

**1.     The <u>*Bruton* and Hearsay Violations</u>.**

In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court affirmed that that an out-of-court statement by a codefendant that implicates the defendant is inadmissible in a joint trial when the codefendant who made the statement does not testify at the trial. *Id.* at 125. In such cases, "the risk that the jury will not, or cannot, follow [limiting] instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. Consequently, under *Bruton* a defendant's Sixth Amendment Confrontation Clause rights are violated and a severance mandated if a nontestifying codefendant's confession or equivalent hearsay names the defendant. Under *Richardson v. Marsh*, 481 U.S. 200, 202 (1987) these rights are also violated if the out-of-court

14

hearsay otherwise links the defendant to the crime, even if the confession was redacted to omit the defendant's name.   More generally, a severance could be warranted where "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that defendant was guilty." *Zafiro v. United States,* 506 U.S. 534, 539 (1993) (citing *Kotteakos v. United States,* 328 U.S. 750, 774-775 (1946)).

The tapes here are littered with inadmissible hearsay in many respects far worse than what the Supreme Court addresses in *Bruton.* Mr. Devito is accused with his three codefendants in Count Fifteen of a substantive mail fraud in violation of 18 U.S.C. § 1341 in regard to the Brae Burn property, alleging that the property was damaged intentionally to allow false insurance claims to be made on it.   Count Fourteen charges all four defendants under 18 U.S.C. § 1349 with mail fraud conspiracy from January, 2003 and February, 2005 for alleged agreement to submit false insurance claims for water damage at two residences, one of which was Brae Burn. The tapes are littered with hearsay statements concerning, among other things, the Brae Burn allegations.  In particular, Mr. Devito's co-defendants, make numerous statements on the tapes that implicate not only themselves but also Mr. Devito concerning the Brae Burn allegations.   Time after time after time in the tapes, declarants state that Devito was responsible for causing flooding at Brae Burn, putting in fraudulent insurance claims for damage to the property, putting in fraudulent claims for personal property at the site, and other culpable assertions.   These statements are made, among others, by Liscio, Cardasco and DiDonato, Mr. Devito's co defendants.   Under *Bruton,* severance is mandated.   The tapes exacerbate the statements by the codefendants by also containing hearsay comments by the

government informants that underscore the allegations against Mr. Devito in respect to the Brae Burn property.[2]

While these statements, of course, may be admissible against Mr. Devito's codefendants, Mr. Devito could not cross examine them at a joint trial. The net result is a lengthy body of evidence that if admissible against the codefendants, is flagrant hearsay as to Mr. Devito. *Bruton* says that juries could not be expected to pay attention to an instruction to disregard the evidence as to the defendant as to whom it is hearsay. This is most certainly the case here and squarely invokes the remedy of severance that *Bruton* counsels.

## 2. The Co-Conspirator Statement Exception Does Not Apply.

It is anticipated that the government will claim that there is no *Bruton* violation because the statements in question would be admissible as statements in furtherance of a conspiracy. *See, e.g., United States v. DeVillio*, 983 F.2d 1185, 1193-94 (2d Cir. 1993)(No *Bruton* violation where statements in question fall under co-conspirator statement exception). But, as the tapes themselves clearly disclose, Mr. Devito clearly was *not* a member of any conspiracy when the statements were made, nor do historical statements about Brae Burn qualify as furthering a conspiracy.

Under Fed.R.Evid. 801(d)(2)(E), a statement made by a coconspirator in furtherance of the conspiracy is nonhearsay on the theory that a co-conspirator making a statement to further the conspiracy is speaking as the agent of the other conspirators. Thus, a statement falls under this rule if there was a conspiracy whose members included the declarant and the party against whom the statement is offered, and the statement was made during the course of and in furtherance of the conspiracy. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 175 (1987); *United States v. Thai,* 29 F.3d 785, 813-14 (2d Cir. 1994).

---

[2]   The government previously advised counsel that the informants, DeBello and Lamanna would not be called at trial. Recently, the government was asked to reconfirm this and declined to furnish an answer either way.

Initially, statements by DeBello and Lamanna are unequivocally not admissible under this exception because they are made by government agents.   Apart from that, it is plain at the outset that the co-conspirator exception could not apply here for the simple reason that Mr. Devito was clearly not a member of any conspiracy which the statements on the tapes could conceivably further.   The only prospective conspiracy under discussion in the tapes is DeBello's desire to deliberately inflict damage, most likely water damage, at one of his homes and to make an insurance claim on which he could profit.   The case can certainly be made that the others captured on tape, including the other defendants, showed their interest in the idea.

But the tapes are entirely barren of any indication whatsoever that Devito even knew about much less supported the idea.   To the contrary, repeatedly on the tapes the other speakers express concern if not fear that Devito would find out.   They affirmatively state that they do not want Devito to find out and implicitly agree not to tell him.   During the entire period of time, as is frequently referenced in the tapes, Mr. Devito is in prison.   At one point, they even discuss doing the job at a different house of DeBello's on Long Island, a measure that even more clearly excludes Devito given that any involvement of his with Brae Burn had no connection to Long Island and the suggestion is made by DeBello to prevent Devito from knowing about their efforts.

In addition, it is clear that Devito is affirmatively despised and has angered the other speakers on the tapes.   A litany of expletives from "scumbag" to "piece of shit" to "devil" is used to characterize Devito. DeBello makes clear his anger that Devito made claims on Brae Burn in amounts far exceeding what he said he would.   Liscio is angry that his insurance business was compromised by the Brae Burn claim.   To the

extent he can be considered a conspirator,[3] Robbie Modello, Mr. Devito's cousin, absolutely blasts Devito in these conversations.

For all of these reasons, Mr. Devito unequivocally is *not* a member of any prospective conspiracy to inflict damage on a house of DeBello and to fraudulently collect insurance proceeds on it. He is in prison and doesn't know about it, and the others involved have no intention of telling him. It has long been noted that conspiracies can exist notwithstanding a degree of tension among some members or even some members not being aware of others. However, as the Second Circuit has repeatedly observed, there is no conspiracy where the members are at "cross purposes." *E.g., United States v. Thompson*, 76 F.3d 442, 454 (2d Cir. 1996); *United States v. Heinemann,* 801 F.2d 86, 92 n. 1 (2d Cir.1986); *see United States v. Harrison*, 942 F.2d 751 (10th Cir. 1991); *United States v. Camiel*, 689 F.2d 31 (3d Cir. 1982); *United States v. Gallo*, 1998 WL 9848 (S.D.N.Y. 1999)(finding separate conspiracies charged and granting severance).

Otherwise put, "in order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Martino,* 664 F.2d 860, 876 (2d Cir.1981). Here, however, it is abundantly clear that Devito had no knowledge whatsoever of the "collective venture" discussed on the tapes. And, the participants in those conversations clearly deemed themselves at "cross purposes" with Devito – to the point that they did not tell him of their venture, did not want him to know, and feared him finding out. It would be nothing short of a perversion of the agency concept of co-conspirator statements to suggest that these men spoke on behalf of Devito.

Another reason why the statements about Brae Burn are not co-conspirator statements is because they are historical, retrospective statements that do not further the prospective conspiracy under discussion.

---

[3] The government has refused to identify co-conspirators.

It has long been settled that statements that are merely "idle chatter" or that are "entirely retrospective" are not in furtherance of the conspiracy. *United States v. Lieberman,* 637 F.2d 95, 102-03 (2d Cir.1980). Statements relating past events satisfy the in-furtherance test only if they serve some current purpose in the conspiracy, such as to "promote [ ] cohesiveness," *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir. 1991) or to provide reassurance to a coconspirator, *United States v. Rivera,* 22 F.3d 430, 436 (2d Cir. 1994). No such affirmative, forward-looking purposes are seen in the tapes here. Rather, the informants, DeBello, in particular, seem obsessed with talking about the past Brae Burn episode because they are furious with Devito and, working with the government, intent on collecting evidence on tape.

For all of these reasons, the co-conspirator statement exception would not apply here.

### 3. The severe prejudice to Mr. Devito also mandates severance.

Apart from hearsay and the lack of confrontation of statements regarding charged offenses, the tapes are chock full of the most severely prejudical statements imaginable regarding Mr. Devito. There are insinuations of organized crime affiliations, references to other crimes or bad acts such as gambling, other frauds. The speakers on the tape hold Mr. Devito in the utmost of contempt and direct volleys of expletives and character assassination at him. Additionally, whether related to charged offenses or not, the bulk of these statements are purely speculative and made without basis or foundation. Under Rules 401, 403, 404(b) not to mention fundamental due process, none of these statements would be permitted from live witnesses at a trial of Mr. Devito, nor should they be permitted as hearsay on tapes even if admissible against codefendants.

**C.    Admission of the Tapes Would Also Violate the Confrontation Clause Because they are Testimonial Under *Crawford v. Washington*, 541 U.S. 36 (2004).**

The tapes are also inadmissible against Devito because their admission would violate the Confrontation Clause in that they are testimonial within the meaning of *Crawford v. Washington,* 541 U.S. 36 (2004).

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with witnesses against him." U.S. Const. Amend. VI.  In *Crawford v. Washington,* 541 U.S. 36 (2004), the Court held that out-of-court "testimonial" statements that were not subject to cross-examination by the defendant cannot be admitted under the Confrontation Clause.  The Court held that with respect to "testimonial" hearsay, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 68  The Court noted that the Confrontation Clause applies to "witnesses" who bear testimony, including where such testimony is from out of court in the form, for example, of  a declaration or affirmation made for the purpose of establishing or proving some fact. *Id.* at 51. The Court declined to define "testimonial." However, it noted that: "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury or at a former trial; and to police interrogations." *Id.* at 68.

With respect to the informants DeBello and Lamanna, counsel for Devito were advised by the government that neither man will be called by the government, and consequently will be unavailable. DeBello and Lamanna make significant substantive statements on the tapes.  Such self-serving and scripted statements on government-sponsored tapes are obviously "testimonial" in that the government and the speakers know that the statements are being made for development of judicial evidence.  DeBello and Lamanna clearly do not intend to go forward with the crime, but rather are simply seeking to develop evidence for an investigation, and continually refer to Devito's past involvement at Brae Burn to that end.

20

To allow such statements before the jury without benefit of cross-examination would constitute a flagrant violation of the Confrontation Clause.

The analysis is different with respect to Liscio, Cardasco, DiDonato and others on the tapes. Although Liscio, Cardasco and DiDonato as defendants in a joint trial would not be subject to confrontation, the analysis differs whether their statements could be considered "testimonial" under *Crawford*.  In *United States v. Saget,* 377 F.3d 223, 229 (2nd Cir.2004), the Second Circuit held that "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford."*  The Court relied in particular upon *Crawford*'s approving citation of *Bourjaily v. United States,* 483 U.S. 171 (1987), as a case that "admitted statements made unwittingly to a Federal Bureau of Investigation informant after applying a more general test that did *not* make prior cross-examination an indispensable requirement." *Crawford,* 541 U.S. at 55. In *Bourjaily,* the Court held that even though the defendant had no opportunity to cross-examine the declarant at the time that he made the statements and the declarant was unavailable to testify at trial, the admission of the declarant's statements against the defendant did not violate the Confrontation Clause. *See id.* at 182. *Saget* thus concluded that "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford."*

Even as to Liscio, Cardasco and others heard on the tapes, the seemingly broad holding of *Saget* is in fact dictum as to the facts here, and accordingly is distinguishable.  Contrary to the implication of *Saget*, *Crawford* is not single mindedly focused on whether the declarant of a particular testimonial item wittingly or unwittingly knows the statements he is making are to be used in court.  The reference to *Bourjaily* at most suggests that the typical statement in furtherance of a conspiracy would not be regarded as testimonial even

21

if surreptitiously recorded by a government agent. Here, however, for the reasons stated above, the statements are not co-conspirator statements and would not fall under any such categorical analysis.

Moreover, *Crawford* focuses as much or more on whether the persons procuring the statement intend to use it in court. In an important footnote in *Crawford,* the Court notes that "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse – a fact borne out time and again throughout a history with which the Framers were keenly familiar." 541 U.S. at 52 n.7. Here, that inference is more than amply justified. This was not simply the gathering of evidence by law enforcement during the commission of a crime, but rather, with a mind towards the development of trial evidence. The codefendants and others were taped by individuals who themselves had a motivation in developing evidence for the government and also in respect to their civil litigation against Mr. Devito. And the statements by Liscio and Cardasco and others cannot be divorced from the volume and substance of statements made by DeBello in particular who were making the tapes. DeBello and Lamanna lard the tapes with statement after statement of rumor, gossip, innuendo, conclusion, and invite the other speakers to pile on. They clearly do not intend to go forward with the crime, but rather are seeking to develop evidence for an investigation and to tar Devito with allegations without regard to truthfulness or reliability. These were not men asking questions or just doing what is necessary to get the others to speak. Rather, they were manipulating and adding to the record being made. To characterize these tapes as non-testimonial simply on the assumption that the speakers not working for law enforcement did not know that elevates form over substance. This case squarely presents the capacity for abuse that *Crawford* held animates the requirement of confrontation.

Finally, on behalf of Mr. Devito, we dispute that the non-law enforcement speakers definitively did not believe they were being recorded and demand a fact finding hearing on this point. It is noteworthy in this

regard that on one of the tapes Liscio states that at one point he believed he was being recorded in a prior conversation with Sonny, Mr. Devito's father, and tailored his remarks to be sharply critical of Devito apparently in order to send a message. Nov 10, 2004 Transcript at 23. Liscio's hostile remarks to Devito on the tapes do not rule out his belief that he was taped and desire to make a statement accordingly. For these reasons, if the Court will not order the severance on these facts, there should be an evidentiary hearing on this point.

II.    **Count Thirteen Must Be Severed From the Other Counts Because It Unnecessarily and Prejudicially Places Devito's Prior Conviction Before the Jury.**

Count Thirteen must be severed from the other counts because it unnecessarily and prejudicially places Devito's prior conviction before the jury. Count Thirteen charges Mr. Devito with obstruction of justice in violation of 18 U.S.C. § 1503 through submission to the Department of Probation of an allegedly false affidavit of net worth. Of necessity, the proof on this point will involve Mr. Devito's prior conviction for bank fraud and will create intolerable prejudice.

Count 13 must be severed whether under Rule 8 or under Rule 14. Rule 14 is discussed above. Under Rule 8(a) of the Federal Rules of Criminal Procedure, joinder of criminal charges is permissible where the charges are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed.R.Crim.P. 8(a). Rule 8(b) joinder of parties is examined under a more exacting standard of whether there is participation "in the same act or transaction, or in the same series of acts or transactions." As the Court of Appeals has held, "Unless the standards set out in Rule 8(b) are met, a motion for severance should be granted even absent a showing of prejudice." *United States v. Feyrer*, 333 F.3d 110, 113 (2d Cir. 2003). Because of the presence of multiple counts and multiple defendants, it is submitted that the Rule 8(b) standard applies under *United States v.*

23

*Turoff,* 853 F.2d 1037, 1043 (2d Cir.1988).  However, it has also been noted that there is some uncertainty on the point in this circuit.  *See United States v. Shellef*, 507 F.3d 82, 97 (2d Cir. 2007).

Regardless of whether Rule 8(a) or 8(b) applies, Count 13 is misjoined with the other counts in the indictment.  Although concerning a declaration of "net worth" and consequently of some superficial similarity to the bank fraud counts said to be based in part on representations of income and assets, Indictment, ¶ 8, at bottom there is no sufficient nexus between a required submission to the Department of Probation and the processes underlying the real estate purchases at issue in the bank fraud counts. Critically, there is *no allegation* anywhere that any of the bank fraud counts turn on any representation as to the assets of *defendant Devito*.  Thus, the obstruction of justice charge, even under the more lenient Rule 8(a) test is not of the "same or similar character" of other counts in the indictment and certainly not part of any common scheme or plan.  Nor would it satisfy the more difficult Rule 8(b) test for participation in the same acts, transactions or offenses.

In any event, this Court can and indeed must sever Count 13 under Rule 14 as well.  The litigation of Count 13 will necessarily reveal to the jury defendant's prior conviction for bank fraud, the reason why he had to make disclosures to the Department of Probation.    In no way shape or form would the prior conviction of Mr. Devito be admissible on the government's case here.   It would be particularly prejudicial here because it involves bank fraud allegations just as are alleged here against Mr. Devito in multiple counts in the indictment.

The Second Circuit and other courts have held that where a count would result in the revelation to the jury of a defendant's prior conviction there should be a severance or other comparable relief.   This is common, for example, in cases including a count charging the defendant with being a felon in possession of a weapon.  *See, e.g., United States v. Jones*, 16 F.3d 487, 492 (2d Cir. 1994).  In *Jones,* the Second Circuit

ordered a new trial because a felon in possession count was tried together with other offenses, notwithstanding the defendant's rejected motion for a severance or bifurcation of the trial. The Court of Appeals held that the limiting instruction the trial court gave was entirely inadequate:

> To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities.

*Id.* at 493 (quoting *United States v. Daniels,* 770 F.2d 1111, 1118 (D.C.Cir.1985)). *See also United States v. Aldrich*, 169 F.3d 526 (8th Cir. 1999)(following *Jones* in case with felon in possession charges); *United States v. Joshua,* 976 F.2d 844 (3d Cir.1992) (cited by *Jones;* bifurcated trial iappropriate when government joins felon in possession count with other charges and felony would be otherwise inadmissible); *United States v. Dockery,* 955 F.2d 50 (D.C.Cir.1992) (cited by *Jones;* district court abused discretion by not bifurcating trial or other procedures sufficient to curb prejudice of ex-felon count); *United States v. Desantis,* 802 F.Supp. 794, 803 (E.D.N.Y.1992) (cited by *Jones;* severing ex-felon count because of manifest danger of prejudice).

The Court in *Jones* also questioned the prosecution's professed commitment to a fair trial for the defendant in question. In that case. the felon in possession charge was only added after a hung jury on the initial set of charges, and the superseding indictment was not based upon new evidence. Here, the charge, not added until the fourth superseding indictment, cannot be said to add anything of substance to a case centered on multiple counts of bank fraud and insurance fraud. Defendant submits that this new charge is about presenting a prior conviction more than anything else. An alleged inaccurate disclosure on a form to a probation officer seems to constitute the proverbial tail wagging the dog -- a prior conviction barking loudly to the jury. For these reasons, whether under Rule 8 or Rule 14, Count 13 must be severed from the other counts in the indictment.

**III.**     **The Bank Fraud and the Insurance Fraud Counts Should Also Be Severed From Each Other.**

The bank fraud and the insurance fraud counts should also be severed from each other because they are misjoined under Rule 8 and should be severed as a matter of discretion under Rule 14 in any event. Defendant Devito joins in the motion submitted by defendant Cardasco on these points.

<u>**CONCLUSION**</u>

The motions for severance should be granted.

Dated:   New York, New York
        June 23, 2008

Respectfully submitted,

_____

Robert A. Culp, Esq.                George L. Santangelo, Esq.
  Of counsel                      111 Broadway, Suite 1706
                                    New York, New York 10006
                                    (212) 269-4488
                                    Attorneys for Defendant, Dominick Devito